UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CAMILLE ANNE ENDERS,          :
                              :
        Plaintiff             :    No. 1:13-CV-01987
                              :
    vs.                       :    (Judge Caldwell)
                              :
CAROLYN W. COLVIN, ACTING     :
COMMISSIONER OF SOCIAL        :
SECURITY,                     :
                              :
        Defendant             :

MEMORANDUM AND ORDER

BACKGROUND

        The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Cammile Anne Enders's claim for social security
disability insurance benefits.

        Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.
The last date that a claimant meets the requirements of being
insured is commonly referred to as the "date last insured."  It is
undisputed that Enders met the insured status requirements of the
Social Security Act through September 30, 2008. Tr. 19, 145, 153
and 193.[1]  In order to establish entitlement to disability
insurance benefits Enders was required to establish that she
suffered from a disability on or before that date. 42 U.S.C. §

_____

1.  References to "Tr.___" are to pages of the administrative
record filed by the Defendant as part of the Answer on September
20, 2013.

423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

On June 21, 2010, Enders protectively filed[2] an application for disability insurance benefits. Tr. 17, 54, 143-145 and 153.  On November 3, 2010, the Bureau of Disability Determination[3] denied Enders's application. Tr. 17 and 55-59. On December 30, 2010, Enders requested a hearing before an administrative law judge. Tr. 62.  After 14 months had passed, a hearing was held on March 1, 2012. Tr. 28-53.  Enders was represented by counsel at the hearing. Id.  On March 14, 2012, the administrative law judge issued a decision denying Enders's application. Tr. 17-27.  As will be explained in more detail infra the administrative law judge found that Enders had a combination of mental health impairments, including alcohol addiction, which was severe and met the requirements of listed impairments making Enders presumptively disabled but that absent the alcohol addiction Enders had no severe mental or physical impairments on or prior to the date last insured and, consequently, Enders was not entitled to disability benefits. Tr. 19-27.  On May 1, 2012,

---

2.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.  Tr. 55.

Enders filed a request for review with the Appeals Council. Tr. 13. After the passage of over 12 months, the Appeals Council on May 24, 2013, concluded that there was no basis upon which to grant Enders's request for review. Tr. 1-5. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Enders then filed a complaint in this court on July 23, 2013. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on January 21, 2014, when Enders filed a reply brief.

Enders was born in the United States on September 16, 1958, and was 50 years of age when her insured status expired on September 30, 2008. Tr. 31, 54, 143, 145 and 1434.

Enders graduated from high school in or about 1977 and can, read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change and using a checkbook and money orders. Tr. 32, 156, 167, 661 and 1434. After graduating from high school, Enders enlisted in the United States Air Force. Tr. 32. While in the Air Force she received training as a cook and worked in that capacity until 1984 when she was honorably discharged with an ending rank

_____

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

of E-4, Sergeant. Tr. 32 and 519.  In 1987 Enders completed one year of college. Tr. 157.

Enders's work history covers 31 years and at least 8 different employers. Tr. 146-151 and 172-179.  The records of the Social Security Administration reveal that Enders had earnings in the years 1974 through 2001 and 2003 through 2005. Tr. 146. Enders's annual earnings range from a low of $498.75 in 2005 to a high of $22,431.40 in 2000. Id.  Enders total earnings during those 31 years were $316,406.42. Id.

A vocational expert identified Enders's past relevant employment[5] as follows: (1) an accounting clerk described as semi-skilled, sedentary work, and (2) a prep cook described as unskilled, medium work.[6] Tr. 48. Enders last worked as an

---

5.  Past relevant employment in the present case means work performed by Enders during the 15 years prior to the date her claim for disability benefits was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565. To be considered past relevant work, the work must also amount to substantial gainful activity. Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.

6.  The terms sedentary, light, medium, heavy and very heavy work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are

(continued...)

accounting clerk in 2001 and the worked performed by her in 2003 through 2005 did not amount to substantial gainful activity.[7] Tr. 146.

---

6.   (...continued)
          met.

          (b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

          (c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

          (d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

          (e) *Very heavy work*.  Very heavy work involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.  If someone can do very heavy work, we determine that he or she can also do heavy, medium, light and sedentary work.

20 C.F.R. § 404.1567.

7.  In 2003 Enders earned $2858.88, in 2004 $3606.31 and in 2005 $498.75. Tr. 146.

Enders contends that she became disabled on December 31, 2005, because of both mental and physical impairments.[8]  Tr. 143 and 157.  In documents filed with the Social Security Administration, Enders only alleged one mental impairment, that being memory loss. Tr. 157.  The physical impairments alleged were neuropathy in the feet, diabetes, seizures, a broken pelvis, arthritis in the right hand and vision problems. Id.  In the present appeal Enders contends she suffers from stress and anxiety, neck and back pain, burning and numbness in her feet, arthritic pain in her right hand, diabetes with peripheral neuropathy, depressive symptoms, memory difficulties, urinary frequency and incontinence, seizures, high blood cholesterol, high blood pressure and alcohol dependence.  Tr. 33-47 and 156-163; Document 12, Plaintiff's Brief, p. 3.  Enders further claims that

---

8.  Enders was 47 years of age on her alleged disability onset date and considered a "younger individual" whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c).  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  When Enders turned 50 on September 16, 2008, 14 days before her date last insured, she moved into the category of a "person closely approaching advanced age." 20 C.F.R. § 404.1563(c).  The Social Security Administration considers a claimant 50 to 54 who has a severe impairment and limited work experience as someone who may not be able to adjust to other work.  Id.  If Enders would have amended her alleged disability onset date to September 16, 2008, and if the ALJ would have limited her to sedentary work and also found that she had no transferable job skills and was unable to perform her prior relevant work, she would have been entitled to disability insurance benefits. See Medical-Vocational Rules 201.00(g) and 201.6, 20 C.F.R. Part 404, Subpart P, Appendix 2.

she suffered from those conditions prior to her date last insured. _Id._

The record reveals that Enders has a long and substantial history of alcohol abuse prior to her alleged disability onset date as well as after that date.  Furthermore, Enders has a history of abusing controlled substances, including marijuana.

For the reasons set forth below we will affirm the decision of the Commissioner denying Enders's application for disability insurance benefits.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if

we would have decided the factual inquiry differently."); Cotter
v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by
the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence."); Keefe v. Shalala, 71
F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176
(4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529
n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565
(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197,
229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d
198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360
(3d Cir. 1999).  Substantial evidence has been described as more
than a mere scintilla of evidence but less than a preponderance.
Brown, 845 F.2d at 1213.  In an adequately developed factual
record substantial evidence may be "something less than the weight
of the evidence, and the possibility of drawing two inconsistent
conclusions from the evidence does not prevent an administrative
agency's finding from being supported by substantial evidence."
Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all
the other evidence in the record," Cotter, 642 F.2d at 706, and
"must take into account whatever in the record fairly detracts

8

from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the

national economy" means work which exists in significant
numbers either in the region where such individual
lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating claims for disability insurance benefits.  See 20
C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process
requires the Commissioner to consider, in sequence, whether a
claimant (1) is engaging in substantial gainful activity,[9] (2) has
an impairment that is severe or a combination of impairments that
is severe,[10] (3) has an impairment or combination of impairments
that meets or equals the requirements of a listed impairment,[11]

---

9.  If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further.

10.  The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no
impairment or combination of impairments which significantly
limits the claimant's physical or mental abilities to perform
basic work activities, the claimant is "not disabled" and the
evaluation process ends at step two. Id.  If a claimant has any
severe impairments, the evaluation process continues.  20 C.F.R.
§ 404.1520(d)-(g). Furthermore, all medically determinable
impairments, severe and non-severe, are considered in the
subsequent steps of the sequential evaluation process.  20 C.F.R.
§§ 404.1523 and 404.1545(a)(2).

11.  If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step. 20 C.F.R. § 404.1525 explains that the listing of
impairments "describes for each of the major body systems
impairments that [are] consider[ed] to be severe enough to

(continued...)

(4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. <u>Id</u>.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. <u>Id</u>.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  <u>Id</u>; 20 C.F.R. § 404.1545; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

---

11.  (...continued)
prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

12.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

If the administrative law judge at one of the steps of the sequential evaluation process finds that a claimant is disabled and there is medical evidence of drug addiction or alcohol abuse, the administrative law judge must determine whether or not the drug addiction or alcoholism is a contributing factor material to the determination of disability.  The Social Security regulations set forth the procedure to be followed in making this determination.  Those regulations state as follows:

(a) *General.* If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(b) *Process we will follow when we have medical evidence of your drug addiction or alcoholism.* (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

(i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability

12

20 C.F.R. § 404.1535 (emphasis added).  In deciding this issue of materiality of drug or alcohol abuse, it is important for the administrative law judge to consider all of the psychiatric or physical impairments that remain after excluding the impairments caused by drug and alcohol abuse.  The administrative law judge must address in his decision the psychiatric and physical impairments raised by the evidence and decide whether or not each impairment is medically determinable, and if an impairment is medically determinable, whether the condition is severe or non-severe. See footnote 10, *supra*.  Furthermore, if it is not possible to disentangle the limitations attributable to drug addiction or alcoholism from those caused by the other psychiatric or physical impairments, the administrative law judge cannot conclude that substance abuse, whether drug or alcohol abuse, is a contributing factor material to the determination of disability. See Brueggemann v. Barnhart, 348 F.3d 689, 693-696 (8th Cir. 2003).

**Medical Records**

Before we address the administrative law judge's decision and the arguments of counsel, we will review the relevant medical records.  We will primarily focus on the records of medical treatment received by Enders prior to the date last insured.

The first medical records that we encounter relate to inpatient treatment at the VA Medical Center in Lebanon, Pennsylvania, from August 7 through August 12 and August 14 through September 4, 2003, for alcohol intoxication and alcoholism. Tr. 725-728.  On August 7, 2003, Enders was admitted to the VA Medical Center after binge drinking for two weeks. Tr. 727.  Enders did well on a Valium taper[13] which finished on August 11th at which time it was noted that "[h]er anxiety was bearable and she was not tremulous." Id.  Enders was discharged to home under the care of her husband until August 14th when she was to report to the VA Medical Center for an inpatient rehabilitation program. Id.  During these two hospitalizations Enders received group and individual counseling and therapy. Tr. 727-805. With respect to the second phase of this hospitalization (from August 14th to September 4th) it was reported that Enders "was fully integrated into the drug and alcohol rehabilitation program," "[s]he made a good effort and acceptable progress," "[t]reatment goals were met," "[s]he had no acute medical or psychiatric problems while in the program," "her diabetes remained under reasonable control," and "[s]he did have pain from her peripheral

---

13.  "Valium (diazepam) is a benzodiazepine . . . used to treat anxiety disorders, alcohol withdrawal symptoms . . . ." Valium, Drugs.com, http://www.drugs.com/valium.html (Last accessed June 28, 2014).

14

neuropathy in both feet." Tr. 726.  On September 4, 2003, her

discharge diagnosis included alcohol dependence and depression,

not otherwise specified, and she was given a Global Assessment of

Functioning (GAF) score of 60, and it was stated that her previous

GAF was 55.[14] Tr. 725. It was noted with respect to her

competency: "Discharged as competent and employable." Tr. 726.

_____

14.  The GAF score allows a clinician to indicate his judgment of
a person's overall psychological, social and occupational
functioning, in order to assess the person's mental health
illness. *Diagnostic and Statistical Manual of Mental Disorders*
3-32 (4th ed. 1994). A GAF score is set within a particular range
if either the symptom severity or the level of functioning falls
within that range. Id. The score is useful in planning treatment
and predicting outcomes. Id.  The GAF rating is the single value
that best reflects the individual's overall functioning at the
time of examination.  The rating, however, has two components:
(1) symptom severity and (2) social and occupational functioning.
The GAF is within a particular range if either the symptom
severity or the social and occupational level of functioning
falls within that range.  When the individual's symptom severity
and functioning level are discordant, the GAF rating reflects the
worse of the two.  Thus, a suicidal patient who is gainfully
employed would have a GAF rating below 20.  A GAF score of 21-30
represents behavior considerably influenced by delusions or
hallucinations or serious impairment in communication or judgment
or inability to function in almost all areas.  A GAF score of 31-
40 represents some impairment in reality testing or communication
or major impairment in several areas,  such as work or school,
family relations, judgment, thinking or mood. Id.  A GAF score of
41-50 indicates serious symptoms or any serious impairment in
social, occupational or school functioning.  Id.  A GAF score of
51 to 60 represents moderate symptoms or any moderate difficulty
in social, occupational, or school functioning. Id. A GAF score
of 61 to 70 represents some mild symptoms or some difficulty in
social, occupational, or school functioning, but generally
functioning pretty well with some meaningful interpersonal
relationships. Id.

Also, it was stated that her condition on discharge was "[s]lightly improved" and her prognosis for sobriety "fair." Id.

Six days later on September 10, 2003, Enders's husband called a social worker at the VA Medical Center and reported that Enders had "relapsed and was found sitting at a bus stop with his loaded rifle" and that Enders "was charged with simple assault and incarcerated in Cumberland Co. prison." Tr. 730.  By September 23, 2003, Enders had been sentenced to time served and released from the county prison. Tr. 729. Enders then called the VA Medical Center "requesting assistance with obtaining out[patient] services[.]" Id.  Enders also reported that she was moving to North Carolina with her husband. Id.  After this medical record reporting Enders's inquiry about outpatient services, the administrative record contains no further information regarding treatment during 2003 or 2004.

On March 11, 2005, Enders was transported to the emergency department of the Chambersburg Hospital by the Pennsylvania State Police. Tr. 645-647. At the hospital Enders reported that she had a history of depression and was having thoughts of hurting herself. Id.  Enders also reported that she had been drinking Vodka and tea. Id.  Her blood alcohol level was

0.26.[15] Id.   The diagnostic assessment was that Enders suffered
from depression with suicidal ideations and ethanol intoxication.
Id. Enders was informed that with such a high blood alcohol level
she would have to wait several hours for her blood alcohol level
to decrease before she could be evaluated and treated for
depression. Id.   In the interim, Enders's husband arrived at the
hospital and agreed to "accept responsibility for [her] to take
her home, and [would] bring her back at some point when they
[were] ready to be seen by Crisis for [a] psychiatric evaluation
and treatment." Id.

     Enders visited the emergency department at the
Chambersburg Hospital on April 16 and May 4, 2005. Tr. 642-644.
The visit on April 16th was for treatment of a dog bite. Tr. 643.
During the visit on May 4th Enders reported continuing pain
associated with that dog bite. Tr. 642.  It was noted that Enders
was intoxicated and abusive to nursing staff. Id.  It was further
observed the dog bite appeared to be "healing well." Id.  Enders
was prescribed Vicodin for pain and "warned not to drive or drink
alcohol while taking the pain medicine." Id.

     On July 13, 2005, about six months prior to her alleged
disability onset date of December 30, 2005, Enders had a seizure,

_____

15.  The legal limit in Pennsylvania is .08 percent.  75
Pa.C.S.A. § 3731.

17

possibly related to alcohol withdrawal. Tr. 219-223 and 592-599. She visited the emergency department at the Chambersburg Hospital and was admitted to that facility for treatment and remained at the hospital until July 15, 2005. Id.

The specific circumstances of this hospital visit were as follows.  Enders while visiting the drive-through of a McDonald's rear-ended a car in front of her. Tr. 219.  When Enders initially appeared at the emergency department of the Chambersburg Hospital she was confused, combative and had dilated pupils but subsequently became well behaved, alert and oriented to person, place and time. Id.  Enders reported that she smoked 1 pack of cigarettes per day and "[drank] a lot" and her last drink was on Friday, July 8th. Id.  When an attending physician reviewed her symptoms,[16] she denied any fever or chills, blurred or double vision, hearing loss, nasal discharge, sore throat, chest pain or palpations, cough, sputum production, nausea, vomiting, abdominal pain, dysuria (painful urination), and urinary frequency or urgency. Id.  Enders reported that she bit her tongue and that she had a history of a fall a week prior to the visit to the emergency department. Id.  The results of a physical examination were

---

16. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu /clinicalmed/ros.htm (Last accessed June 27, 2014).

essentially normal other than it did appear that she had bitten
her tongue and she had a rapid pulse of 114 and her blood pressure
was 144/92. Id. An MRI of the head did not reveal any significant
abnormality. Tr. 220. A CT scan of the head did not reveal any
acute abnormalities. Tr. 224. Blood tests revealed low potassium
and sodium, a low platelet count[17], and a high blood sugar level.
Tr. 220. The diagnostic assessment on the day of admission to the
hospital was as follows: (1) a new onset seizure; (2) non-insulin
dependent diabetes mellitus; (3) high blood pressure; (4)
depression and anxiety; (5) hypokalemia (low potassium); (6) mild
hyponatremia (low sodium); (7) mild thrombocytopenia (a low level
of platelets) question secondary to alcohol use; and (8) alcohol
use, question alcohol abuse. Id. Enders was prescribed the anti-
epileptic/anticonvulsant drugs Dilantin and Neurontin and the high
blood pressure medication Avapro, and also was given medications
for diabetes and intravenous fluids containing potassium,
magnesium and sodium. Id.

During her stay at the hospital Enders was evaluated by
Rajnikant P. Lad, M.D., a psychiatrist, and underwent an
electroencephalogram (EEG) of the brain. Tr. 222 and 600-601.
After performing a clinical interview and a mental status

_____

17. Platelets (thrombocytes) are blood cells involved in the
blood clotting process.

19

examination, Dr. Lad concluded that Enders suffered from bipolar disorder, not otherwise specified, and alcohol abuse and he gave her a GAF score of 70, the high end of the range representing mild symptoms. Id. Dr. Lad recommended that Enders be prescribed an anti-seizure medication which also had mood stabilizing properties. Id. He recommended either Depakote or Tegretol. Tr. 601. The results of the EEG were normal. Tr. 222.

The diagnostic assessment at discharge on July 15th was as follows: (1) new onset seizure, questionable alcohol withdrawal; (2) history of alcohol abuse; (3) nicotine addiction; (4) diabetes; (5) hypokalemia; (6) high blood pressure; (7) peripheral neuropathy; (8) depression/anxiety; (9) thrombocytopenia secondary to alcohol use; and (10) hyponatremia. Tr. 223. Based on Dr. Lad's recommendation, at the time of discharge Enders was prescribed Depakote and she was advised to follow-up with her family physician in one week;[18] it was reported she was feeling well, eating well, and ambulating without difficulty; and her vital signs were stable and she had no seizure activity. Tr. 224-225. Also, at the time of discharge a follow-up appointment with Staton E. Sollenberger, D.O., was scheduled for August 8, 2005, and Enders was advised to have blood work

---

18.  The record of this follow-up appointment is not contained within the administrative record.

performed prior to that appointment[19] and she was further advised that she was prohibited from driving a motor vehicle for six months. Id.

At the appointment with Dr. Sollenberger on August 8th Enders reported that she did not have blood withdrawn as requested. Tr. 218. Dr. Sollenberger's notes of this appointment also reveal an inconsistent statement by Enders. Id. Enders told Dr. Sollenberger that she was a "recovered alcoholic and had not been drinking for months" before the recent seizure. Id. Dr. Sollenberger noted that Enders "seem[ed] to be tolerating the Depakote well" and no further seizures were reported. Id. Dr. Sollenberger reported that blood work had been scheduled and a follow-up appointment scheduled after Enders had that blood work performed. Id. However, Enders never had the blood work performed. Tr. 216-217. Dr. Sollenberger treatment note of October 10, 2005, states in toto as follows: "Camille is in the office today she is doing well on Depakote ER 500 mg 3 at hs.[20] We are still encountering glitches in getting her blood work for the time of the app[ointment]. I am assuming everything is okay with it and I will probably get it eventually. I will see her back in

_____

19. The blood work was to determine whether she was taking the Depakote as prescribed and receiving therapeutic levels of that drug. Tr. 218.

20. The letters "hs" is an abbreviation for "at bedtime."

a month to try again.  I will see her sooner if need be." Tr. 217.
Dr. Sollenberger's treatment note of February 7, 2006, is
similarly worded, i.e., reporting that Enders failed to have blood
work, and Dr. Sollenberger also reported that Enders "had no
seizures since her first lifetime seizure in July [2005]." Tr.
216.

On April 4, 2006, over three months after the alleged
disability onset date, Enders visited the Chambersburg Hospital
emergency department complaining of bilateral lower extremity
swelling. Tr. 640.  Enders reported having symptoms of peripheral
neuropathy and that the drug Neurontin helped alleviate those
symptoms but that presently her lower extremities were "more
tender than normal." Id.  She reported tightness and discomfort in
her lower extremities and also noted that they felt warmer than
usual. Id. Enders reported that she smoked but did not use
alcohol. Id.  She had no complaints of dysuria or urination
frequency or urgency. Tr. 639.  The results of a physical
examination were essentially normal other than she had some lower
extremity edema and slight redness over the areas of edema. Tr.
640. Blood tests revealed a high glucose level consistent with
diabetes but no other significant abnormalities. Tr. 639.  The
diagnostic assessment was that Enders suffered from "[b]ilateral
lower extremity edema, most probably secondary to fluid

retention." Id.   Enders was already taking the drug hydroclorothiazide, a diuretic often prescribed to treat high blood pressure,[21] and the dosage of that drug was increased and she was advised to follow-up with her primary care physician. Id.

On July 23, 2006, Enders visited the emergency department of the Chambersburg Hospital complaining of a scalp laceration. Tr. 635-636.   Enders admitted drinking alcohol and stated that she lost her balance and hit her head against a drawer. Tr. 635.   She denied any loss of consciousness, headaches, neck or back pain, trouble breathing, chest pain, and abdominal pain. Id.   When the attending physician reviewed her systems, she denied suffering from any musculoskeletal problems. Id. The results of a physical examination were essentially normal other than an obvious scalp laceration and the odor of an alcoholic beverage on her breath. Id.   It was specifically noted that her cervical, thoracic and lumbar spine was nontender. Id.   Diagnostic tests were ordered including blood work and a CT scan of her head. Id. Her blood alcohol level was reported to be .354, more than 4 time the legal limit. Tr. 698. The CT scan of the head revealed mild brain atrophy but no acute infarct, hemorrhage, midline shift or hydrocephalus. Tr. 637.   A metabolic profile of her blood

---

21.   Hydrochlorothiazide, Drugs.com, http://www.drugs.com/hydrochlorothiazide.html (Last accessed June 28, 2014).

revealed a slightly low potassium level and her Depakote level was low. Tr. 698. Enders admitted that she may have missed some doses of Depakote and that she had a problem with alcohol. Id. Sutures were applied to the scalp laceration. Id.  At discharge the diagnostic assessment was status post fall, scalp laceration and ethanol intoxication. Id.  Enders was advised to follow-up with the medical clinic in 10 days to have the sutures removed. Id.

On August 11, 2006, Enders had an appointment with Dr. Sollenberger. Tr. 215.  Enders reported she was doing well and had no seizures since she saw Dr. Sollenberger in February, 2006. Id. Dr. Sollenberger noted that Enders's levels of Depakote were therapeutic and that Enders reported no symptoms suggesting toxicity of any type.[22] Id.  Dr. Sollenberger stated that the results of Enders's complete blood count and liver function tests were "fine." Id.  Dr. Sollenberger scheduled a 9-month follow-up appointment. Id.

On February 26, 2007, Enders was taken by ambulance to the emergency department of the Chambersburg Hospital for treatment of depression. Tr. 542. Enders admitted that she was off her medications and drinking heavily and hardly eating. Tr. 542-543. Enders stated that she had not worked outside the house for about 2 years. Tr. 542.  When the attending physician reviewed

---

22.  Depakote may cause a decrease in the blood platelet count.

Enders's systems, Enders denied leg swelling or pain, neck or back pain, headaches, loss of consciousness and recent seizures or blackouts. Id.  The results of a physical examination were essentially normal other than she had a rapid pulse and high blood pressure and smelled strongly of the odor of alcoholic beverage. Tr. 543. She had no edema in her lower extremities and she moved "all extremities equally;" her neck was supple; and her behavior was appropriate and cooperative and she was not slurring her speech. Tr. 542-543.  Diagnostic tests were performed including a chest x-ray which was unremarkable. Id.  Her blood alcohol level initially was 0.233 and after an unspecified period of time had elapsed it was 0.118. Id.  Enders declined admission to the hospital and was discharged to the care of her husband on the same day. Id. The discharge diagnosis was acute alcohol intoxication, history of alcoholism, history of depression without suicidal ideation, history of diabetes and hypertension. Id.

On August 5, 2007, Enders visited the emergency department at the Chambersburg Hospital complaining of depression. Tr. 540.  The attending physician noted that she was "just ready to leave the department" when he "entered the room to exam[ine] her" and that "[s]he agreed to see Crisis." Id.  Enders admitted "drinking some alcohol earlier" that day and blood tests, consequently, were ordered. Id.  The results of a physical

25

examination were essentially normal other than a rapid pulse and high blood pressure. Id.  Mental health personnel were notified, and a request to have blood withdrawn was made, but Enders "eloped from the department" before any further intervention or testing could be performed. Id.

From August 6 to August 31, 2007, Enders was hospitalized at the VA Medical Center in Lebanon for depression and alcoholism. Tr. 236-238, 250-266, 274-291 and 810-814. There were two phases to this hospitalization, an initial detoxification program (from August 7 through August 13th) and then an admission to a psychiatric unit for counseling and therapy (from August 14 through August 31st). Id.  A review of the records of this extended hospitalization reveals that Enders admitted to a long history of alcohol and drug abuse. Id.  Enders admitted using cocaine 2 times, smoking marijuana during high school and also using "speed and LSD." Tr. 1142.

At the time of admission on August 6th Enders admitted that she had been drinking all her life and engaging in heavy drinking for the last 10 years. Tr. 810.  She stated that she had not been eating recently and on that day had two large drinks of Vodka and lemonade. Id.  She further stated that she had increased her alcohol consumption over the last 30 days. Id.  The results of a physical examination performed on August 6th were essentially

26

normal other than it was observed that she was "unsteady and [she] was walking with the assistance of her husband." Tr. 811-812. The diagnostic impression on August 6th was severe depression, alcohol dependence, noninsulin dependent diabetes mellitus, peripheral sensory neuropathy with ambulation dysfunction[23] and seizure disorder by history. Id. The attending physician recommended admission for alcohol detoxification and psychiatric counseling. Id.

During a psychiatric assessment by a registered nurse on August 7th Enders reported using a fifth of Vodka per day, smoking marijuana a month prior to her hospitalization, using alcohol on and off since age 15, using cocaine when she was 17 years old, and presently smoking 1.5 to 2 packs of cigarettes per day. Tr. 872. Enders reported "spending most of the day drinking and watching TV." Tr. 873. Enders also stated that she "has not been walking except from couch to 'freezer to the Vodka and back to the couch and maybe if lucky – to bed.'" Tr. 960. When asked during one interview how she spends her day, Enders replied "watching TV and drinking Vodka all day" and when asked how she copes, she answered "Vodka – I drink myself numb, then finally I fall asleep." Id.

---

23. The record does not note the cause of the ambulation dysfunction but we can safely assume that in addition to the peripheral neuropathy in her feet a contributing cause was her consumption of alcohol on that day.

She also stated on August 7th that she drinks every day, all day and does not eat and has lost 50 pounds in the last 5 months. Tr. 902.  When asked how often she had six or more drinks on one occasion, she stated "daily or almost daily." Tr. 1160.

A treatment note by Robert A. Kirk, M.D., a staff psychiatrist, dated August 13th indicates that Enders during the hospitalization admitted that she commenced abusing alcohol at the age of 15 and further admitted using marijuana as recently as a month prior to being admitted to the hospital. Tr. 237-245. Enders further stated that she could not "hold a job due to her alcoholism." Tr. 237.  During a cognitive impairment screening, Enders's score was "not consistent with cognitive impairment." Id. The results of a physical examination during this period (August 7th through August 13th) were essentially normal. Tr. 238. Enders was able to ambulate without assistance but did have decreased sharp/dull sensation in both feet. Id.

Also, on August 13th Enders was examined by Richard G. Emler, a certified physicians assistant. Tr. 262-266.  During that examination, Enders admitted "using a fifth of Vodka per day" and that she had been "binging now for approximately four months." Tr. 262.  However, she denied other drug use which was inconsistent with some of her other statements. Tr. 262. When Mr. Emler reviewed Enders's systems, Enders denied joint pain or swelling

28

and chronic low back pain and denied pain or stiffness in her neck. Tr. 264.  She reported a history of only one isolated seizure. Tr. 264, 1158 and 1188.  The results of a physical examination performed by Mr. Emler were essentially normal. Tr. 264-265.  Enders had good muscle bulk, full range of motion of the joints and an unremarkable gait. Tr. 265.  Dr. Kirk cosigned Mr. Emler's examination report. Tr. 266.  On August 13th Enders was given a GAF score of 40 by another physicians assistant who examined her. Tr. 268 and 271.

During Enders's extended hospitalization she visited with her husband and a pet, went to a picnic and a party, played bingo, and kept busy doing crossword puzzles, playing chess, and playing cards. Tr. 820-821, 828, 834, 847 and 849.  Treatment notes reveal that other patients enjoyed her company because she was funny and enjoyed telling jokes. Tr. 847. After August 13th, during the second phase of the hospitalization, Enders denied physical complaints and socialized by watching television, reading the newspaper and playing table games. Tr. 1109, 1131, 1133 and 1217-1218.  Enders expressed a desire to return to work and considered looking for a part-time job. Tr. 1128, 1174, 196, 1219, 1251 and 1266.

When Enders was discharged from the hospital on August 31st it was noted with respect to physical activities that she had

"[n]o restrictions." Tr. 251. The record reveals that during the course of the hospitalization Enders was given GAF scores of 40 and 45 but that at the time of discharge on August 31st she was given a GAF score of 60, the high end of the range representing moderate symptoms.  Tr. 234, 275, 280 and 291. At the time of discharged Enders was considered "competent and employable." Tr. 234, 248 and 1101.

On September 7, 2007, Enders visited a VA medical facility regarding her recent admission for alcohol intoxication. Tr. 430-431. When the attending physician reviewed Enders systems, the only item reported by Enders was recent weight loss. Tr. 430. Enders denied neck pain and joint pain (arthragias). Id.  The results of a physical examination were essentially normal other than the attending physician noted that Enders had an enlarged liver and spleen and some localized swelling in the legs below the knees. Tr. 431.  However, Enders was released without limitations and advised to follow-up with her primary care physician. Id. Also, on September 7th Enders appears to have visited a VA medical facility regarding left flank pain and underwent a Kidney, Ureter and Bladder (KUB) series of x-rays. Tr. 332, 428 and 544. The possibility of a kidney stone was ruled out by a subsequent CT scan on October 1, 2007. Id.  There was a 5 mm calcification observed over the left ureter which was suggested could represent

a calcification within the iliac artery. Id. Further testing and studies were recommended. Tr. 414.  However, no such studies appear in the record.

On September 24, 2007, Enders was evaluated by a cardiologist for complaints of chest pain. Tr. 419-423.  After performing a clinical interview and physical examination, the cardiologist's impression was in toto as follows: "This is a 49-year-old woman with diabetes and long standing tobacco use and complaints of shortness of breath.  There may be very rare instances of chest discomfort. I have recommended she undergo an exercise tolerance test, which we were able to perform in the office at this visit and this is essentially unremarkable." Tr. 420. Enders exercised to Stage II of a standard Bruce protocol, completing 4 minutes on the treadmill and achieving a maximum heart rate of 150 beats per minute representing 88% of the maximum age predicted heart rate and achieving 7.0 METS.[24] Tr. 422.

---

24.  METs is an abbreviation for metabolic equivalents, a term used to represent the intensity of exercise.  1 MET stands for the amount of oxygen you consume and the number of calories you burn at rest. 7 METs means that Enders was working 7 times harder than if she was just sitting at rest.  Exercising at moderate intensity is estimated to be 3-6 METs. See MET - The standard metabolic equivalent, About,com Sports Medicine, http://sportsmedicine.about.com/od/glossary/g/MET.htm (Last accessed June 27, 2014).  Walking slowly, less than two miles consumes 2 METs per hour. Shoveling snow consumes 6 METs per hour. See MET-hour equivalent of various physical activities, Harvard Health Publications, Harvard Medical School,

(continued...)

On October 10, 2007, Enders had an HGB A1C blood test performed which revealed that Enders's diabetes was not under control.[22] Tr. 323.   The laboratory report of the test reveals that the result was 9.7 percent representing poorly controlled diabetes. Id.  According to the laboratory report the "adequate diabetic control target" percentage is less than 7.0 percent. Id. On October 30, 2007, Enders had an appointment at a VA medical facility to have her medication adjusted. Tr. 299. During that appointment Enders denied having headaches, blurry vision, chest pain or discomfort, nausea, vomiting, abdominal pain, dysuria,

_____

(...continued)
http://www.health.harvard.edu/newsletters/Harvard_Womens_Health_W atch/2009/December/met-hour-equivalents-of-various-physical-activ ities (Last accessed June 27, 2014).


22.  The A1C blood test is a test that measures the amount of glycated hemoglobin or glycohemoglobin in the blood.  It is used to monitor the control of diabetes mellitus.  Glycohemoglobin is hemoglobin to which glucose is bound.  Glucose stays attached to hemoglobin for the life of the red blood cells, 120 days.  A1C reflects the average blood glucose and gives a good estimate of how well an individual manages his or her diabetes over the prior 2 to 3 months.  The normal A1C level is 7% according to the American Diabetes Association and 6.5% according to the American Association of Clinical Endocrinologists. American Diabetes Association, Estimated Average Glucose, http://www. diabetes.org/living-with-diabetes/treatment-and-care/blood-glucos e-control/estimated-average-glucose.html (Last accessed June 27, 2014).  Normal fasting blood glucose is 70-99 mg/dl and normal blood glucose 2 hours after eating is 70-145 mg/dl. Diabetes Health Center, Blood Glucose, WebMD, http://diabetes.webmd.com/ blood-glucose?page=3 (Last accessed June 27, 2014).

dizziness, fainting, motor disturbance, sensory disturbance and numbness. Id. She did report uncontrolled blood glucose levels and polyuria (excessive or abnormally large production or passage of urine). Id.  However, Enders was not taking her medications as prescribed and as noted no sensory disturbances were identified during the examination. Id. Furthermore, it was observed that she had normal strength, gait and station. Id.

On November 6, 2007, Enders visited the Lebanon VA Medical Center and requested that medical providers there become her primary physicians.[23] Tr. 246-247 and 1332.  Treatment notes indicate that Enders's liver function tests were within normal limits and that she had good results taking the medication Gabapentin for peripheral sensory neuropathy. Id.  Her medication for diabetes was changed from glipizide to Avandia in light of the recent HGB A1C test result of 9.7 and the change was effective in bringing her sugar level under better control. Id.  A physical examination revealed that she had a normal gait. Id.

As of November 21, 2007, Enders reported continued abstinence from alcohol. Tr. 1326-1327 and 1330. Enders declined a referral to endocrinology for further treatment of her diabetes. Tr. 446-447 and 449.

---

23.  Enders was being treated by physicians at Dunham Army Clinic in Carlisle under Tricare, a health care program for members of the military, military retirees and their families.

On January 1, 2008, Enders visited the emergency
department at the Chambersburg Hospital complaining of neck and
arm pain. Tr. 538. Enders reported three days of pain in the left
side of her neck and down her left arm. Id. During this visit
Enders stated that she "missed drinking alcohol tonight." Id.
Enders denied any other symptoms. Id.  An x-ray of the cervical
spine revealed moderate cervical spondylosis,[24] degenerative disc
disease at C5 through C7 and no fractures. Tr.  539 and 692. A
chest x-ray was unremarkable. Tr. 539.  The results of a physical
examination were normal, including her blood pressure was 104/64
and her pulse 68. Tr. 538. Enders was neurologically intact. Id.
She had good sensation and motor strength. Id.  Enders left the
hospital against medical advice before cardiac studies were
completed. Tr. 539.

On May 7, 2008, Enders visited the emergency department
of the Chambersburg Hospital complaining of a seizure earlier that
day. Tr. 536. Enders was at a Sheetz convenience store when she
had a 2 to 3 minute episode of generalized tonic-clonic activity

---

24.  Degeneration of the vertebrae and intervertebral discs is
medically referred to as spondylosis. Spondylosis can be noted on
x-ray tests or MRI scanning of the spine as a narrowing of the
normal "disc space" between the adjacent vertebrae. The term is
frequently used to describe osteoarthritis of the spine.

with a postictal period of 20 minutes.[25] Id.  Enders, however,
admitted that she had not been taking her seizure medications for
2 to 3 days and that she had been seizure free for 4 years since
she had been taken those medications. Id.  Enders reported no
bladder or bowel incontinence and she did not bite her tongue. Id.
During the seizure she only bent the "tip of her left nail
backwards, otherwise, [she felt] fine." Id.  She had no headaches,
chest pain, or any other signs or symptoms. Id. The results of a
physical examination were essentially normal, including she had
intact sensation, motor strength and reflexes. Id. Her blood
pressure and pulse were elevated. Id.  It was recommended that she

---

25.  Generalized seizures involve "electrical impulses throughout
the entire brain."  There are six categories of generalized
seizures: (1) "grand mal" or generalized tonic clonic involving
unconsciousness, convulsions and muscle rigidity; (2) absence
involving brief loss of consciousness; (3) myoclonic involving
sporadic, isolated jerking movements; (4) clonic involving
repetitive jerking movements; (5) tonic involving muscle
stiffness and rigidity; and (6) atonic involving loss of muscle
tone.  Epilepsy Seizure Types and Symptoms, WebMD,
http://www.webmd.com/epilepsy/guide/types-of-seizures-their-sympt
oms (Last accessed June 28, 2014). There are three phases to a
seizure. The preictal phase is the time leading up to the
seizure. The ictal phase is the seizure itself. The postictal
phase is the period after the seizure. The postictal phase may
last from seconds to days, depending on the type of seizure, and
during that phase a variety of symptoms can be observed. After
Seizure Symptoms, Livestrong.com, http://www.livestrong.
com/article/124340-after-seizure-symptoms/(Last accessed June 28,
2014).  Those symptoms can include headaches, confusion,
drowsiness, muscle soreness, weakness and psychiatric
disturbance. Id.

recommence taking Depakote and she was discharged from the hospital in a stable condition. Id.

Enders returned to a VA medical facility on August 13, 2008, for a follow-up relating to her diabetes and routine blood tests. Tr. 402-404. Enders reported 82 days of sobriety but had been out of her depression and high blood pressure medication for awhile. Tr. 403. Enders also reported being "moody." Id.  An HGB A1C blood test performed on August 13, 2008, was 6.2 percent representing "adequate diabetic control[.]" Tr. 320.

On August 26, 2008, Enders visited the emergency department at the Chambersburg Hospital complaining of trouble breathing which resolved while she was waiting to be seen. Tr. 533-534 and 629. Enders admitted that she had been drinking a significant amount of alcohol and fell on the edge of her bedpost. Tr. 629.  Enders stated that her depression was causing her to drink more and that she was not taking her prescribed ant-depressant medications. Id.  The diagnostic assessment was that Enders suffered from acute chest wall pain/contusion and chronic alcohol abuse. Tr. 534. Enders declined a referral to a mental health counselor and stated that she would stop drinking that day. Tr. 534 and 629.

Enders returned to the emergency department of the Chambersburg Hospital on September 16, 2008, complaining of chest

pain which resolved while she was waiting to be seen. Tr. 508-509. During a consultation with Indranil Chakrabarti, M.D., Enders admitted that she was drinking up to a fifth of Vodka a day to the point of being intoxicated and passing out. Tr. 518. She reported that the impetus for her drinking was her depression and anxiety related to the deployment of her sons to Iraq. Tr. 518 and 520. Enders also admitted smoking marijuana. Tr. 494.  A urine drug screen was positive for marijuana and benzodiazepines. Id.  Enders reported that she was unable to obtain a job since 2006. Tr. 519. However, she stated that she was enrolled in an on-line course in "home billing and coding" and getting good grades. Tr. 520. Enders once stabilized was transferred on a voluntary basis to the behavioral health unit of the hospital for treatment of depression. Tr. 396, 399, 520 and 523. Enders remained hospitalized until September 23, 2008, when she was discharged and referred to outpatient mental health counseling and treatment. Tr. 394-395, 1356-1357 and 1359-1360.

Enders's date last insured as stated earlier in this memorandum was September 30, 2008, and there are no further relevant medical treatment records contained within the administrative record. However, there are three items of relevance prepared after the date last insured: (1) a report of a consultative examination at the request of the Bureau of

Disability Determination, (2) an opinion of a state agency physician who reviewed Enders's medical records, and (3) a Psychiatric Review Technique form prepared by a state agency psychologist who reviewed Enders's medical records.

On September 22, 2011, Enders was examined by Thomas W. McLaughlin, M.D., on behalf of the Bureau of Disability Determination. Tr. 567-580. Dr. McLaughlin conducted a clinical interview and physical examination but in assessing Enders's medically determinable impairments and functional abilities relied exclusively on Enders's statements and his physical examination findings which were essentially normal. Id. Enders did have elevated blood pressure. Tr. 569. However, Enders had a normal gait; she was able to stand unassisted and rise from a seated position and step up and down from the examination table without difficulty or assistive devices; she had no evidence of edema in the extremities or peripheral vascular insufficiency; she had normal pulses in the extremities; she had negative straight leg raising tests; she had no radicular pain although back tightness; her cervical spine was non-tender and there was no evidence of paravertebral muscle spasm; she had no evidence of weakness or muscle atrophy in the legs; she was able to walk on her heels and toes; she had normal sensation to light touch, pinprick and vibration; and she had normal reflexes and normal (5/5) motor

strength. Tr. 569-572.  Dr. McLaughlin did not review any of Enders's medical records. Tr. 572.

On a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activity" form, Dr. McLaughlin indicated that Enders could occasionally lift and carry up to 25 pounds; she could stand and walk one to two hour in and eight-hour day; she could sit up to eight hours in an eight-hour day while alternating positions between sitting and standing at will; she could never bend, stoop, crouch, balance, or climb; and she should be restricted from working at heights or around machinery. Tr. 579-580.

One of the medical conditions Dr. McLaughlin relied on in assessing Enders's functional ability was "[b]ack pain secondary to fracture of L5 with degenerative disease of the lumbosacral spine. Id.  This condition, however, developed in July, 2011, well-after Enders's date last insured. Tr. 567. Dr. McLaughlin also reported that Enders suffered from a 10-year history of diabetes with peripheral neuropathy, tobacco use, high blood pressure, high cholesterol, and a history of seizures and alcohol use. Tr. 568.  Dr. McLaughlin's inclusion of diabetes with peripheral neuropathy accompanied by burning and numbness of her feet and lower legs as an impairment was obviously based on statements from Enders. Id.  Dr. McLaughlin stated that the

peripheral neuropathy had improved, though not totally resolved, with the drug Neurontin. Id.

With respect to Enders's alcoholism, Dr. McLaughlin noted that Enders continued to drink only on an occasional basis, i.e., "on holidays and special occasions and at times on Saturday." Id.  However, the record reveals that Enders was treated at Roxbury Treatment Center ("Roxbury") located in Shippensburg, Pennsylvania, from January 11, 2011 until February 8, 2011. During the intake evaluation at Roxbury, Enders admitted drinking 1 pint of Vodka daily for the past 2 years. Tr. 652. Also, on November 14, 2010, Enders visited the emergency department at the Chambersburg Hospital complaining of chest pain. Tr. 623-624.  Enders reported during that visit that she was an alcoholic and that she "drinks chronically every day." Tr. 623. A blood alcohol test revealed that Enders's blood alcohol level was 0.339. Tr. 624.

On September 21, 2010, J. Brenner, D.O. reviewed the evidence of record and opined that Enders's main issue prior to her date last insured was alcohol abuse. Tr. 547.  He noted that her physical examinations were generally unremarkable, except for some decreased sensation distally, but opined that this was not a disabling physical impairment. Id.

On October 20, 2010, Richard Small, Ph.D., a state agency psychologist, reviewed the medical evidence of record and completed a Psychiatric Review Technique form in which he stated there was insufficient evidence of any mental impairment prior to Enders's date last insured. Tr. 548-560.

No treating physician provided a statement of the severe mental or physical conditions which Enders suffered from on or prior to the date last insured absent alcoholism or a statement of Enders's work-related functional abilities.

**Discussion**

The administrative law judge at step one found that Enders had not engaged in substantial gainful activity since December 31, 2005. Tr. 19.

At step two, the administrative law judge found that Enders suffers from the following severe impairments: "alcohol abuse, Major Depressive Disorder, and Generalized Anxiety Disorder[.]" Id.  The administrative law judge also found that Enders's diabetes with peripheral neuropathy was a non-severe impairment, her alleged low back/pelvis condition, arthritis in her right hand, urinary incontinence, vision problems, and seizures were non-severe impairments on or prior to the date last insured. Tr. 20.

41

At step three, the administrative law judge found that Enders's impairments met the criteria of Listing 12.04, Affective Disorders,  and Listing 12.09, Substance Addiction Disorders. Because the administrative law judge found that Enders was disabled at step 3, the administrative law judge was required to follow the procedure set forth in 20 C.F.R. § 404.1535 referred to earlier in this memorandum.  Most importantly, the administrative law judge had to determine which of Enders's psychiatric and physical conditions remained after Enders stopped using alcohol and then determine whether those remaining conditions were disabling.

The ALJ determined that after alcoholism was excluded that Enders did not suffer from any severe physical or mental impairments.  In so doing the ALJ appropriately considered the medical records and the opinion evidence.

Enders's main argument is that the administrative law judge erred when he found that she did not have disabling symptoms during the periods when she was clean and sober and that she retained the ability to work.  She also argues that the administrative law judge erred by failing to appropriately consider the medical evidence regarding all of her severe and non-

42

severe physical and mental conditions,[26] including her diabetes
with peripheral neuropathy, cervical spondylosis and degenerative
disc disease of the cervical spine, and by failing to properly
evaluate the medical opinion evidence.  We have thoroughly
reviewed the record in this case which consists of 1438 pages and
find no merit in Enders's arguments.  It is absolutely clear that
Enders's had a serious problem with alcohol. Furthermore, there is
substantial evidence in the record that absent the alcoholism
Enders did not have any severe impairments.

     The Social Security regulations require that an
applicant for disability insurance come forward with medical
evidence "showing that [the applicant] has an impairment(s) and
how severe it is during the time [the applicant] say[s] [he or she
is] disabled" and "showing how [the] impairment(s) affects [the
applicant's] functioning during the time [the applicant] say[s]
[he or she is] disabled."  20 C.F.R. § 404.1512©.  Enders failed
to provide such evidence. No treating physician provided a

_____

26.  An impairment is "severe" if it significantly limits an
individuals ability to perform basic work activities. 20 C.F.R. §
404.1521; Social Security Ruling 85-28, 96-3p, and 96-4p.  Basic
work activities and aptitudes necessary to do most jobs, such as
walking, standing, sitting, lifting, pushing, seeing, hearing,
speaking, and remembering. <u>Id.</u>  An impairment or combination of
impairments is "not severe" when medical and other evidence
establish only a slight abnormality or a combination of slight
abnormalities that would have no more than a minimal effect on an
individual's ability to work. <u>Id.</u>

statement indicating that Enders on or prior to the date last insured suffered from severe physical or mental conditions or had functional limitations for the requisite continuous 12 month period[27] that would prevent her from engaging any substantial gainful employment, including light and medium work.

No treating physician opined that absent Enders's alcoholism she suffered from work-preclusive impairments on or prior to the date last insured. However, the record contains a statement from a state agency physician, Dr. Brenner, who reviewed the evidence of record and opined that Enders's main issue prior to her date last insured was alcohol abuse and that her physical examinations were generally unremarkable, except for some decreased sensation distally, but opined that this was not a disabling physical impairment. Tr. 547.

The medical records reveal that Enders was diagnosed with some other physical conditions. Specifically, she was diagnosed on one occasion with degenerative disc disease and spondylosis of the cervical spine and there is a reference to mild brain atrophy. There are also references to high blood pressure

---

27. As stated earlier in this memorandum to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

44

and high cholesterol,[28] and that she was diagnosed with bipolar disorder on one occasion and given GAF scores of 40 to 45 during treatment for alcoholism and depression.  However, there is no medical evidence that absent Enders's alcoholism those conditions limited her ability to engage in work prior to the date last insured.[26]

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


S/William W. Caldwell
United States District Judge

Dated: July 2, 2014

_____

28.  There is no evidence in the record that Enders's high blood pressure and high cholesterol caused work-related functional limitations.

26.  Enders argues that the ALJ did not address several conditions, including cervical spondylosis, and that oversight requires remand. The failure to address those conditions was harmless error at most under the circumstances of this case.  See Weary v. Astrue, Civil No. 10-896, slip op. at 40-41 (M.D.Pa. Dec. 15, 2010)(Muir, J.)(applying harmless error analysis); Boyd v. Astrue, Civil No. 11-600, slip op. at 25-26 & 28 (M.D. Pa. May 10, 2012)(Munley, J.).